**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | Case No. 4:19CR146 RLW(SPM) |
| ) | |
| **GARY SCOTT HANCOCK,** ) | |
| ) | |
| **Defendant.** ) | |

**REPORT AND RECOMMENDATION AND ORDER
OF UNITED STATES MAGISTRATE JUDGE**

All pretrial motions in the above cause were referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. §636(b). Currently pending before the Court are Defendant Gary Scott Hancock's Motion for Jencks Act Material (Doc. 39) and Motion to Suppress evidence and statements (Doc. 40).

### I.     BACKGROUND AND PROCEDURAL HISTORY

On February 12, 2019, Hancock was charged in a criminal complaint with one count of knowingly and intentionally distributing fentanyl with death resulting. (Doc. 1). On February 21, 2019, he was indicted for the same offense. (Doc. 15). Hancock was arraigned on March 6, 2019. Through counsel, Hancock requested and was granted until June 3, 2019, to file pretrial motions. After requesting additional extensions of time, Hancock filed the pretrial motions currently pending before the Court on August 5, 2019. (Docs. 39 and 40). The United States filed its response to both motions on August 12, 2019. (Docs. 41 and 42). After conferring with counsel, the undersigned scheduled an evidentiary hearing for August 27, 2019. Defendant appeared at the evidentiary hearing, with counsel. Both parties agreed that the motion for Jencks Act material (Doc. 39) could be decided based upon the parties' written submissions.

Regarding the motion to suppress, the United States clarified that except perhaps for statements made by Hancock's roommate, Kyle Nichols, the United States did not plan to present statements made by any other individuals who were present at Hancock's home. As such, this Report and Recommendation does not address statements that may have been made by anyone else who was present at Hancock's home on February 11, 2019. Defense counsel clarified that Hancock sought suppression of Nichols' statement to police, a syringe seized from Nichols, and Hancock's video recorded statement to officers. Although defense counsel alluded to personal items that may have been seized from Hancock after his arrest, it is unclear what those items were. As discussed below, the evidentiary record established that officers seized and searched Hancock's cell phone following his arrest; but, other than the cell phone, it is unclear whether any other "personal items" were seized and, if so, whether Hancock was seeking suppression of those other items. Indeed, there is little indication in the record of what, if any, item of evidentiary value other than the cell phone was seized from Hancock. As such, this Report and Recommendation is limited to the specific items discussed in the factual findings and legal conclusions.

At the evidentiary hearing, the United States offered testimony of DEA Task Force Officer Daniel Plumb (TFO Plumb) and introduced five exhibits which are listed on the Clerk's Exhibit List. (Doc. 47). Defense counsel cross-examined TFO Plumb, but offered no witnesses or other evidence in support of Hancock's suppression motion.

At the close of the evidentiary hearing, the parties made oral arguments regarding multiple legal issues related to the suppression motion, which the undersigned asked be reduced to writing to aid in resolution of the motion. (Doc. 48). Consistent with the undersigned's scheduling order, and subsequent orders continuing deadlines for the filing of post hearing briefs,

Hancock filed his post-hearing brief on September 13, 2019, and supplemented the same on September 19, 2019. (Docs. 51 and 53). On September 20, 2019, the United States filed its responsive post-hearing brief. (Doc. 54). As such, Hancock's pretrial motions are now fully briefed and ready for a ruling.

**II.    MOTION TO SUPPRESS (DOC. 40)**

Hancock seeks to suppress inculpatory statements his roommate, Kyle Nichols, made to law enforcement on February 11, 2019. Hancock also seeks suppression of a drug-filled syringe seized from Nichols on February 11, 2019. Hancock contends that Nichols' statements and the syringe were fruits of an unconstitutional search of Hancock's residence. Hancock also seeks to suppress a video-recorded statement he made to law enforcement including statements he made during the interview related to his cell phone. Based upon the evidence adduced at the hearing, the oral arguments made on the record, and the written submissions of the parties, the undersigned makes the following findings of fact and conclusions of law.

**A.    FINDINGS OF FACT**

Task Force Officer, Daniel Plumb ("TFO Plumb") is a detective with the St, Peter's Police Department. At the time of the evidentiary hearing, TFO Plumb had been on loan to the DEA as a task force officer for six years. As of the date of the hearing, TFO Plumb had been a police officer for almost thirty years. TFO Plumb's testimony at the evidentiary hearing was largely supported by the documentary and video evidence presented by the United States. Based on my observations of TFO Plumb at the evidentiary hearing, I found TFO Plumb to be a credible and reliable witness.

In the early part of 2019, TFO Plumb was asked to participate in an investigation of an overdose death that had occurred in the city of Chesterfield, Missouri in October of 2018. To get

3

up to speed on the investigation, TFO Plumb thoroughly reviewed the investigative files and spoke with a detective with the Chesterfield Police Department.  Through that process, TFO Plumb learned that Chesterfield police had recovered some information from the victim (T.G.'s) computer, including text messages between T.G. and Hancock (identified only as "Scott" in the text messages), that took place the evening before T.G.'s overdose death.  In the text message exchange, "Scott" agreed to sell five beans of "fenny" to T.G., "beans" being slang in drug parlance for capsules that typically contain heroin or fentanyl.  In the text message exchange, "Scott" provided T.G. with his address so that T.G. could meet him to purchase fentanyl.  Detectives were also able to provide TFO Plumb with the telephone number of "Scott" and, using that telephone number, were able to identify the subscriber of the telephone as the defendant—Gary Scott Hancock.  TFO Plumb also learned that T.G. died as a result of acute fentanyl and acetyl fentanyl intoxication.  A check by the investigators of various police databases revealed that Hancock has provided the address identified in the text messages—4340 Delor—as his street address during booking on several other occasions.

On February 11, 2019, TFO Plumb and DEA Task Force Officer Charlie Neil ("TFO Neil") went to 4340 Delor in the morning hours to locate and arrest Hancock.  They walked up to the front door, which did not appear to be used, and attempted to knock.[1]  Noticing that the side gate was wide open, they went through it to a back/side door that was equipped with a security camera; they knocked on the back door.  They heard movement inside the house and a few seconds later a white male who identified himself as Jason answered the door.  TFO Plumb identified himself as an officer with the DEA and showed his credentials; TFO Neil did the same.  TFO Plumb explained to Jason that they were looking for Hancock.  Jason told the

---

[1] On cross examination, TFO Plumb explained he got the impression the front door was not used because there was a build up of mail at the front door and the gate leading to the back door was wide open.

4

officers he was Hancock's roommate and Hancock was not there.  TFO Plumb asked Jason if he would speak with them about Hancock.  At that point, Jason indicated he would speak with them and stepped back and opened the door to allow the officers to enter 4340 Delor.

Once they entered the house, TFOs Plumb and Neil were in the kitchen of the house with Jason.  They heard a noise coming from another room.  Concerned about who might be present (given that Jason had just told them Hancock was not at home), the officers asked if they could look around for their safety.  Jason indicated that there was someone else in the house and agreed that the officers could look around.  The officers then conducted a protective sweep by moving protectively through the home (one officer just behind the other).  The officers did not open any drawers or look into any locations where one could not conceivably find a human being.  During the protective sweep, the officers encountered Jason's girlfriend and Kyle Nichols, who was laying on the couch in the living room, covered up with a blanket or other covering.

TFO Plumb saw that Nichols was awake and appeared to be moving his hands under the blanket.  He identified himself as a police officer and asked Nichols to show him his hands.  Nichols did not comply and continued to move his hands around under the blanket.  When Nichols did not comply with the command to show his hands, TFO Plumb commanded Nichols to stop moving his hands.  Nichols did not comply.  Concerned for his safety, TFO Plumb used a police-trained tactic—the straight arm bar takedown—to subdue Nichols and attempt to take him into custody.  However, Nichols resisted and he and TFO Plumb got into a physical struggle on the floor of the living room.  Nichols was ultimately subdued and found to be clasping a syringe that was loaded with a substance later identified by Nichols as fentanyl.  The syringe was seized and sent to a DEA laboratory for testing and Nichols was placed under arrest for possession of a controlled substance and transported to the DEA St. Louis division office.  Before leaving 4340

Delor, TFO Plumb gave his business card to Jason (the roommate who had answered the door) and asked him to call if he had any contact with Hancock or if Hancock returned to the residence.

Once at the DEA division office, Nichols was placed in an interview room. Using a waiver of rights form, TFO Plumb advised Nichols of his *Miranda* rights orally and in writing. Nichols indicated that he understood his rights and signed the form; Nichols' acknowledgement that he understood his rights was witnessed by both TFO Plumb and TFO Neil. *See* Govt. Exh. 4. TFO Plumb proceeded to interview Nichols, who made statements implicating Hancock in criminal activity. Among other statements, Nichols told TFO Plumb that the loaded syringe seized by law enforcement was filled with fentanyl and he had acquired it from Hancock. Nichols prepared a written statement in response to questions posed by TFO Plumb.

Later in the day on February 11th, and consistent with TFO Plumb's request that Jason contact him if he heard from Hancock, Jason called TFO Plumb indicating that he told Hancock the police had been at the house. Shortly after the call with Jason, TFO Plumb received a call from Hancock, who indicated that he was at his mother's house but would be back at 4340 Delor within a half hour. As a result, TFOs Plumb and Neil returned to 4340 Delor. TFOs Plumb and Neil, together with two other officers, were present when Hancock returned to the house. Initially, Hancock seemed to think police were at the house to investigate a burglary and to evict Jason from the house. TFO Plumb told Hancock he couldn't help him with that and identified himself as an agent with the DEA and indicated that he needed to talk to Hancock about an ongoing drug investigation. At that point, TFO Plumb handcuffed Hancock and took him into custody.

6

When they arrived at the DEA division office, Hancock was booked by TFO Plumb, during which TFO Plumb asked Hancock for pedigree information. TFO Plumb then placed Hancock into an interview room where he began the interview by advising Hancock of his *Miranda* rights using a waiver of rights form. Hancock indicated that he understood his rights and signed the form. Hancock's acknowledgement that he understood his rights was witnessed by both TFO Plumb and a second Task Force Officer, Matt Main. *See* Govt. Exh. 1. TFO Plumb then proceeded to interview Hancock who was cooperative and responsive to TFP Plumb's questions. The interview was video recorded and a copy of the interview is a part of the evidentiary record. *See* Govt. Exh. 5.

At the time of the interview, Hancock was 29 years old and, based on a diploma TFO Plumb observed hanging on the wall of Hancock's home, TFO Plumb inferred he was a graduate of the University of Missouri. Hancock had prior petty offense convictions for assault and property damage. Hancock did not appear to have any difficulty communicating with TFO Plumb in English, and did not appear to be under the influence of any substance (legal or illicit), and did not have any apparent physical or mental ailments. The interview lasted for a little over a half hour. During the interview, Hancock made statements that incriminated him in drug trafficking and, specifically, in selling fentanyl to the victim, T.G. whose overdose death the agents were investigating. During the interview, Hancock consented to a search of his cell phone verbally and in writing by executing a DEA consent to search form and by providing TFO Plumb (in writing) with the passcode and appropriate gesture required to unlock the phone. *See* Govt. Exh. 2. [2]

---

[2] Agents seized the cell phone and later applied for, and obtained, a search warrant to search Hancock's phone. *See* Govt. Exh. 3.

Although there were three officers present at the start of the interview, TFO Plumb did all of the talking. None of the officers were armed and no voices were raised during the interview. None of the officers threatened Hancock during the interview and Hancock appeared to be relatively at ease throughout the interview.

### B. CONCLUSIONS OF LAW

While Hancock's arguments are less than clear, Hancock appears to contend that TFOs Plumb and Neil violated his constitutional rights when they approached his home and knocked on the door. Hancock also contends the officers were not lawfully in his residence at the time they encountered Nichols. As such, Hancock posits, Nichols' subsequent statements, any evidence seized from Nichols, and all other statements and evidence obtained by law enforcement must be suppressed as fruit of the poisonous tree. Under the exclusionary rule, evidence obtained in violation of the Fourth Amendment may not be introduced at trial to prove a defendant's guilt. *Elkins v. United States,* 364 U.S. 206, 223-24 (1960) (evidence obtained as the result of an unreasonable search and seizure by state officers cannot be used against defendant in federal court). The purpose of the exclusionary rule is to deter constitutional violations. *See United States v. Leon,* 468 U.S. 897, 906 (1984). The exclusionary rule applies to verbal statements obtained as a result of official misconduct as well as to the more traditional seizure of physical evidence. *United States v. Yousif,* 308 F.3d 820, 832 (8th Cir. 2002) ("Verbal statements obtained as a result of a Fourth Amendment violation are as much subject to the exclusionary rule as are items of physical evidence discovered during an illegal search.").

1.  **TFOS PLUMB AND NEIL DID NOT VIOLATE HANCOCK'S CONSTITUTIONAL RIGHTS BY APPROACHING HIS RESIDENCE AND KNOCKING ON THE BACK DOOR**

Hancock seems to suggest that the officers violated his constitutional rights when they entered his property and knocked on the door on the morning of February 11, 2019.  The Fourth Amendment protects individuals from "unreasonable searches and seizures" by the government.  U.S. Const. amend. IV.  This guarantee extends not only to a residence, but also to the residence's curtilage.  *United States v. White,* 928 F.3d 734, 739 (8th Cir. 2019).  "When the Government obtains information by physically intruding on persons, houses, papers, or effects, a 'search' within the original meaning of the Fourth Amendment has undoubtedly occurred" and such conduct is presumptively unreasonable without a warrant.  *Id.* (quoting *Florida v. Jardines,* 569 U.S. 1, 5 (2013)).  However, it is well-established in the Eighth Circuit that, "consistent with the Fourth Amendment, the knock-and-talk exception to the warrant requirement permits a police officer not armed with a warrant to approach a home and knock."  *Id.*  This exception is based on the "implicit license" all of us, including law enforcement officers, enjoy to approach a home, knock promptly, wait briefly to be received, and then absent invitation to linger longer, leave.  *Id.* at 740.  The knock-and-talk exception cannot justify an officer's warrantless intrusion of the curtilage when that officer objectively exceeds the scope of this implicit license.  *Id.*  Thus, the question of whether the officers acted lawfully by knocking on Hancock's door turns on whether the officers had an implicit license to be there.

Based on the foregoing factual findings, in approaching Hancock's home on the morning of February 11, 2019, the officers were armed with information that Hancock had sold drugs to a person who shortly thereafter died of a drug overdose.  Although the officers were not armed with a warrant, as any private citizen might do, they approached the house and knocked on the

front door. The officers observed that the front door did not appear to be used regularly; they also noticed there was a wide-open gate leading toward the rear of the home. They walked through the open gate to a back door which was equipped with a security camera, suggesting it was regularly used as an entrance to the home. The officers knocked on the back door and it was opened by an occupant in the home. Where, as here, the officers entered on to private property and "restrict[ed] their movements to those areas generally made accessible to visitors—such as driveways, walkways, or similar passageways," they did not violate the Fourth Amendment by entering onto the curtilage of Hancock's residence and knocking, first on the front door, and then on the back door. *White,* 928 F.3d at 739-40.

### 2. TFOs Plumb and Neil Did Not Violate Hancock's Constitutional Rights By Entering His Residence With Jason's Permission

Hancock also suggests the officers violated the Fourth Amendment by entering his residence on the morning of February 11, 2019. TFO Plumb testified that he and TFO Neil went to Hancock's residence on February 11, 2019, to arrest him. However, there is no evidence that the officers obtained a warrant prior to going to Hancock's home on February 11, 2019. Although there are circumstances in which a law enforcement officer may lawfully arrest a person without an arrest warrant, "the Fourth Amendment has drawn a firm line at the entrance to the house [and, generally,] that threshold may not reasonably be crossed without a warrant." *Peyton v. New York,* 445 U.S. 573, 590 (1980). The Eighth Circuit has recognized that "[a]bsent consent or exigent circumstances, a private home may not be entered to conduct a search or effect an arrest without a warrant." *United States v. Faler,* 832 F.3d 849, 853 (8th Cir. 2016). However, "[o]fficers may [lawfully] enter the residence if the officers receive voluntary consent to enter from a person possessing authority over the residence." *Id.* at 854 (citing *United States v. Lakoskey*, 462 F.3d 965, 973 (8th Cir. 2006)). *See also United States v. Wolff,* 830 F.3d 755, 758 (8th Cir. 2016)

10

("Consent to search ... may be given either by the suspect or by some other person who has common authority over, or sufficient relationship to, the [area or] item to be searched."); *United States v. Turbyfill*, 525 F.2d 57 (8th Cir. 1975) (officers lawfully entered suspect's home to question him about a counterfeiting operation where the individual who answered the door stepped back and opened the door wider after the officers identified themselves). Indeed, areas of a home accessed by consent do not implicate the Fourth Amendment because the individual does not have a legitimate expectation of privacy in those areas so long as consent was voluntary, and came from someone authorized to give it. *See Fernandez v. California*, 571 U.S. 292, 301 (2014) (warrantless search was proper because co-occupant gave consent to search residence); *Smith v. City of Wyoming,* 821 F.3d 697, 712 & n.10 (6th Cir. 2016) (voluntary consent to enter defendant's home sufficient to admit evidence where consent was given by defendant's 10 year old daughter who had dialed 911, greeted responding officers at the door and did not object to their entry).

Under Eighth Circuit precedent, the question of whether a person has authority to consent to law enforcement's entry into a residence turns on whether "the facts available to the officer at the moment ... warrant a man of reasonable caution in the belief that the consenting party had authority over the premises." *United States v. Nichols*, 574 F.3d 633, 636 (8th Cir. 2009). Although other circuits have taken a different approach, the Eighth Circuit does *not* impose upon law enforcement any obligation to independently verify a third party's authority to consent. *United States v. Alameida-Perez*, 549 F.3d 1162 (8th Cir. 2008).

The question of whether a person has voluntarily consented to entry by law enforcement is, similarly, a question of reasonableness. Consent may be express or implied and need not be knowing and intelligent even though it constitutes a waiver of Fourth Amendment rights. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 242-43 (1973) (voluntary consent constitutes waiver

11

of 4th Amendment rights). "[A]n officer's credible report of verbal consent can suffice to meet the government's burden of establishing consent" despite conflicting or contradictory evidence from the defense. *Wolff,* 830 F.3d at 758 (quoting *United States v. Harper*, 787 F.3d 910, 914 (8th Cir. 2015) (per curiam)).

In determining whether consent is voluntary, the court must consider the totality of the circumstances including the individual's personal characteristics such as age and mental ability as well as "the environment in which an individual's consent is obtained including (1) the length of any detention; (2) whether the police used threats, physical intimidation, or punishment to extract consent; (3) whether the police made promises or misrepresentations; (4) whether the individual was in custody or under arrest when consent was given; (5) whether the consent was given in public or in a secluded location; and (6) whether the individual stood by silently or objected to the search. *United States v. Dunning,* 666 F.3d 1158, 1165 (8th Cir. 2012). As the Eighth Circuit has put it: "The precise question is not whether [a person] consented subjectively, but whether [their] conduct would have caused a reasonable person to believe that [they] had consented." *United States v. Jones*, 254 F.3d 692, 695 (8th Cir. 2001); *see also United States v. Hampton*, 260 F.3d 832, 835 (8th Cir. 2001) (consent found where individual opened the door and voluntarily and without coercion allowed police to enter).

Based on the foregoing factual findings, it was reasonable for TFOs Plumb and Neil to believe both that Jason had authority over the premises and that he voluntarily consented to allow them to enter the residence. Specifically, prior to going to the residence, TFO Plumb took steps to verify that Hancock lived at 4340 Delor. Once at the residence, TFO Plumb and Neil knocked on the front door with no success. They then went around to the back door and knocked on the back door. It was answered by an occupant in the home who identified himself as Jason,

12

Hancock's roommate. The officers identified themselves as law enforcement, showed Jason their credentials, and told him they were looking for Hancock. Jason told the officers Hancock was not at home and agreed to answer questions about Hancock; in doing so, he opened the door to invite the officers into the residence.

At no point prior to the officers entering the residence did they take Jason into custody or threaten him with physical harm. There is also no evidence that the officers used deception or made promises to Jason to gain entry into Hancock's residence. Instead, the evidence is that the officers told Jason who they were and showed him their credentials. With that knowledge, Jason opened the door and invited them into the residence. In sum, the evidence presented at the hearing demonstrated that Jason appeared to have the authority to consent and did in fact voluntarily consent to the officers entering Hancock's residence on February 11th.

### 3. TFOS PLUMB AND NEIL DID NOT VIOLATE HANCOCK'S CONSTITUTIONAL RIGHTS BY CONDUCTING A PROTECTIVE SWEEP BEYOND THE KITCHEN OF HANCOCK'S RESIDENCE

In opposing Hancock's motion to suppress, the United States insists that the officers did not search or request to search Hancock's residence. I disagree. TFO Plumb testified that he and TFO Neil encountered Nichols in the living room area of Hancock's residence while conducting a protective sweep of the home. A "protective sweep is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *United States v. Anderson,* 688 F.3d 339, 346 (8th Cir. 2012) (citing *Maryland v Buie,* 494 U.S. 325, 327 (1990)). A protective sweep does not violate the Fourth Amendment if the searching officer possessed a reasonable belief based on specific and articulable facts that the area swept harbored an individual posing a danger to the officer or to others. *Buie,* 494 U.S. and

13

327. The Eighth Circuit has held that protective sweeps are permissible when additional factors, such as voluntary consent, for the sweep are present. *Anderson,* 688 F.3d at 346 (citing cases).

Based on the factual findings, the officers initially entered the residence through the kitchen. They remained in the kitchen talking to Jason for a few seconds until they heard a shuffling noise coming from another room, which suggested someone else was in the house. Concerned for their safety, TFO Plumb asked if they could look around. Jason consented and the officers, thereafter conducted a protective sweep, which included the living room area. It was during the protective sweep that TFOs Plumb and Neil encountered Nichols laying on the couch in the living room. Because the sweep was confined to areas where a person could be found and because it was done with the consent of Hancock's roommate, it did not violate the Fourth Amendment. As such, the officers were lawfully in the living room area of Hancock's residence when they first encountered Nichols.

### 4. THE EXCLUSIONARY RULE DOES NOT APPLY TO THE FENTANYL-FILLED SYRINGE SEIZED FROM NICHOLS OR NICHOLS' STATEMENT TO POLICE

As the United States correctly pointed out in its Response to Hancock's motion, the only item seized while the officers were in Hancock's residence on February 11, 2019, was the loaded syringe taken from Nichols' person immediately before his arrest. Although Hancock was given the opportunity to do so, he has failed to articulate a legal basis for his position that he has standing to object to the seizure of the syringe, and the undersigned has found no authority to support that position. Indeed, because the syringe was seized from Nichols' person and there is no evidence to suggest it was Hancock's personal property, Hancock has failed to demonstrate he has standing to object to its seizure. *See Raskas v. Illinois,* 439 U.S. 128, 133-34 (1978) (holding that "Fourth Amendment rights are personal rights which . . . may not be vicariously asserted.").

Hancock has also failed to articulate any legal basis for his position that he has standing to object to Nichols' post-arrest statement.  Like Fourth Amendment rights, "Fifth and Sixth Amendment rights, … are personal in nature and cannot be asserted vicariously." *United States v. Fortna*, 796 F.2d 724, 732 (5th Cir. 1986). *See also, United States v. Escobar*, 50 F.3d 1414, 1422 (8th Cir. 1995) ("Duarte and Escobar attempt to argue that this statement was made in violation of Keeper's *Miranda* rights. However, Keeper's *Miranda* rights are personal to him, and Duarte and Escobar have no standing to assert this alleged violation.").  Hancock's motion to suppress fails because Hancock lacks standing to object to Nichols' post-arrest statement.

Hancock's motion also fails because, for the reasons set out above, neither the syringe nor Nichols' statement is not the fruit of the poisoned tree.  As the foregoing factual findings demonstrate, the officers were lawfully in Hancock's home and, specifically, lawfully in the living room area of the home when they encountered Nichols.  Their subsequent warrantless arrest of Nichols was entirely justified in that they had probable cause to believe he committed a crime in their presence.  *See Ehlers v. City of Rapid City,* 846 F.3d 1002, 1008-10 (8th Cir. 2017) (warrantless arrest for obstruction was lawful where officer had arguable probable cause based on defendant's disobeying officers instruction).  They took Nichols into custody and, before questioning him, TFO Plumb advised Nichols of his *Miranda* rights, which he acknowledged in writing, before waiving his rights and giving a verbal and written statement that incriminated Hancock in drug trafficking.

In sum, even if Hancock could somehow demonstrate that he had standing to object to Nichols' post-arrest statement and the seizure of the syringe, his motion to suppress—which seeks suppression under the exclusionary rule—fails because the officers' encounter with Nichols was not the result of a violation of Hancock's constitutional rights.

## 5. HANCOCK'S POST-ARREST STATEMENT DID NOT VIOLATE THE FIFTH AMENDMENT

Hancock also seeks to suppress his post-arrest statement to police; but, he has not specified why suppression is warranted. The evidence presented at the hearing demonstrated that Hancock's custodial statements to police, including information he provided to unlock and search his cell phone, were made after he was advised of his *Miranda* rights. Although "[t]he government bears the burden of persuasion and must prove by a preponderance of the evidence that the challenged statements were voluntary," *United States v. LeBrun,* 363 F.3d 715, 724 (8th Cir. 2004), "[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare." *Berkemer v. McCarthy,* 468 U.S. 420, 423 (1984). "The fact that such warnings were given weighs in favor of a voluntariness finding." *United States v. Mendoza,* 85 F.3d 1347, 1350 (8th Cir. 1996).

At the hearing, TFO Plumb credibly testified that after Hancock's arrest, he was taken to the DEA St. Louis field office where TFO Plumb booked Hancock and began the interview by advising Hancock of his *Miranda* rights using a waiver of rights form. Hancock indicated that he understood his rights and signed the form. Hancock's acknowledgement that he understood his rights was witnessed by both TFO Plumb and a second Task Force Officer, Matt Main. *See* Govt. Exh. 1. TFO Plumb then proceeded to interview Hancock who was cooperative and responsive to TFP Plumb's questions. The interview was video recorded and a copy of the interview is a part of the evidentiary record. *See* Govt. Exh. 5.

At the time of the interview, Hancock was a 29 year old college graduate who had some familiarity with the criminal justice system. The entire interview lasted for less than an hour and Hancock did not appear to be under the influence of any substance and did not appear to have

16

any problems communicating with TFO Plumb. Although other officers were present, TFO Plumb did most of the talking. Throughout the interview, there were no weapons present, no voices raised, no physical threats and no coercive or deceptive tactics employed. Based on a totality of the circumstances, the evidence presented at the hearing demonstrated that Hancock's statement to police was voluntarily made after a knowing and voluntary waiver of his *Miranda* rights.

Hancock has articulated no legal basis to justify suppression of his voluntarily given statement. Accordingly, Hancock's motion to suppress his post-arrest statement should be denied.

### III.    MOTION FOR JENCKS ACT MATERIALS (DOC. 39)

Hancock moves for an order compelling the United States to make an early disclosure of Jencks Act Material "forthwith" or at least "one full week before trial." *See* Doc. 39. The United States opposes Hancock's motion but agrees to provide Jencks Act material "no later than Friday before the trial." *See* Doc. 41.

The Jencks Act provides in relevant part:

> (a) In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.
> (b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

18 U.S.C. § 3500.

"Although in many cases the government freely discloses Jencks Act material to the defense in advance of trial, the government may not be required to do so." *United States v. White*, 750 F.2d 726, 729 (8th Cir. 1984); accord *United States v. Green*, 151 F.3d 1111, 1115 (8th Cir. 1998); *United States v. Wilson*, 102 F.3d 968, 971-72 (8th Cir. 1996). Accordingly, the Court denies the motions for early production of Jencks Act material.

For all of the foregoing reasons,

**IT IS HEREBY RECOMMENDED,** that Defendant's Motion to Suppress statements and physical evidence (Doc. 40) be **DENIED**.

The parties are advised that they have **fourteen (14)** days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. *See Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

**IT IS HEREBY ORDERED** that Defendant's Motion for Early Disclosure of Jencks Act Material (Doc. 39) be **DENIED**.

Trial in this case has been set before the **Honorable Ronnie L. White on December 2, 2019, at 9 a.m.**

_____
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 16th day of October, 2019.